<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

JOHN MEE

                   Plaintiff,

    v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                  Defendant.

Civil Action No. 16-122 (SDW)


**OPINION**


December 20, 2016

**WIGENTON,** District Judge.

Before the Court is Plaintiff John Mee's ("Plaintiff" or "Mee") appeal of the final administrative decision of the Commissioner of Social Security ("Commissioner") that he is not disabled under section 1614(a)(3)(A) of the Social Security Act (the "Act"). This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78. This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 405(g). Venue is proper under 28 U.S.C. § 1391(b). For the reasons set forth below, this Court finds that ALJ Olarsch's factual findings are not supported by substantial evidence. Therefore, the Commissioner's decision is **REVERSED** and **REMANDED** to a new administrative law judge for the determination of benefits.

## I.    PROCEDURAL AND FACTUAL HISTORY

### A. Procedural History

On October 21, 2008, Plaintiff applied for Supplemental Security Income Benefits ("SSIB") alleging disability as of May 30, 2000, due to major depression, anxiety and cardiac

disease.  (R. 132-35.)  Plaintiff's application for SSIB was denied both initially and upon reconsideration.  (R. 77-81, 89-91.)  Plaintiff's subsequent request for a hearing before an administrative law judge ("ALJ") was granted, and a hearing was held before ALJ Leonard Olarsch ("ALJ Olarsch") on June 16, 2011.  (R. 15-26.)  On July 18, 2011, ALJ Olarsch issued a decision finding Plaintiff was not disabled and denying his application for disability benefits.  (R. 18-22.)  On April 15, 2013, the Appeals Council denied Plaintiff's request for review of ALJ Olarsch's July 18, 2011 decision and Plaintiff subsequently filed an appeal in the United States District Court for the District of New Jersey. *John Mee v. Comm'r of Soc. Sec.*, 13-3754.  (R. 1-4.)  That matter was remanded by Order dated May 5, 2014 finding that ALJ Olarsch's determination that Plaintiff was not disabled was not supported by substantial evidence. The Court further directed that ALJ Olarsch "adhere to SSR 83-20,[1] seek medical advice and explore other sources of documentation in determining the onset date of Plaintiff's disability." *Id.* at 13.

On September 8, 2015, ALJ Olarsch again issued an unfavorable decision ("2015 Decision").  (R. 2388-99.)  The Plaintiff now seeks reversal of ALJ Olarsh's September 8, 2015 final decision and asks this Court to grant his request for SSIB or other relief as this Court deems appropriate.  (Compl. 1-2.)

### B.  Factual History

#### 1.  Personal and Employment History

Plaintiff was born September 22, 1947 and was 67 years old at the time of ALJ Olarsch's 2015 Decision.  (R. 132.)  Plaintiff has a Bachelor's degree in economics, as well as a Master's

---

[1] SSR 83-20 provides that in cases where "medical evidence from the relevant period is unavailable, it will be necessary to infer the onset date from medical and other evidence that describe the history and symptomology of the disease process." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 548-49 (3d Cir. 2003).

degree in Business Administration.  (R. 1106.)  He was previously married, but divorced in September 1983.  (R. 133.)  He began seeing a psychiatrist for marriage counseling in the early 1980s and continued treatment for depression after his divorce.  (2486-87.)

Plaintiff was a Russian linguist in the military from 1970 through 1973 and worked for the Environmental Protection Agency ("EPA") from 1975 through 1987.  (R. 3389.)  After leaving his job at the EPA, Plaintiff had periods of temporary employment but exhibited "poor work stability." (R. 432, 1106, 2489.)  For instance, he was employed part-time as a telemarketer and later as a customer service representative, but he was asked not to return to work because he was unable to get along with co-workers.  (R. 152, 2489, 3388.)  Plaintiff's condition continued to deteriorate and he was unable to maintain steady employment starting in 1994.  (R. 1106, 2389-90.)  Plaintiff claims he has been unable to work since May 30, 2000.  (R. 147.)

Plaintiff also has a history of unstable housing.  Starting in 1995, Plaintiff began living in an attic of his family-owned home "not outfitted with proper heating, air conditioning, plumbing, ventilation, lighting or bedding."  (R. 2434-35.)  The only plumbing was a toilet in the middle of the room among dust and clutter.  (R. 1106.)  Plaintiff's family offered him a room in a habitable portion of the house,[2] but he refused and opted to move into a homeless shelter during the summer and winter months.  (R. 201.)  In 2005, he became homeless.  (R. 1106.)  In 2007, Plaintiff spent forty days in a Newark homeless shelter and subsequently was admitted to the VA domiciliary on April 9, 2007.  (R. 612.)  By 2008, Plaintiff had moved into a rooming house.  (R. 3390.)

In 2007, Plaintiff entered a treatment program at East Orange Veteran's Hospital ("EOVH") and joined the Compensatory Work Therapy Program ("CWT"), first working in the

_____

[2] Plaintiff completely isolated himself in the attic and had no contact with his family, even though he lived in the same home.  His sister noted Plaintiff never interacted with his nieces and nephews and did not attend family functions.  (R. 564, 2435, 2466.)

3

hospital's greenhouse, and later in the computer room typing resumes and assisting in computer classes. (R. 431, 455, 544, 549, 551.)  In 2008, Plaintiff reported obtaining employment in Jersey City, New Jersey at Metro Scanning.[3]  (R. 328, 356-7.)

Plaintiff had a long history of alcohol dependence that started while he was in the military. (R. 484.)  Plaintiff reported drinking up to a fifth of liquor or 18-20 cans of beer per day, but went to an alcohol rehabilitation facility for treatment and has been sober since July 2007.  (R. 484, 507, 605.)

## 2.  Medical History

The Record reflects that numerous medical doctors and healthcare practitioners have examined Plaintiff in relation to his disability and disability claim. The following is a summary of the medical evidence:

Plaintiff alleged in his original "Disability Report" that he was unable to work due to psychiatric and physical ailments. (R. 1085-87.)  Plaintiff originally contended that he suffered from major depression and coronary artery disease,[4] (R. 147-52), but later amended the report to major depression and anxiety. (R. 169-71.)

The earliest medical records of Plaintiff's disability date back to February of 2007 when he began treatment at East Orange Veterans Hospital, over three years after his date of last insured. (R. 1106.)  At that time, Plaintiff was diagnosed with major depression, anxiety and alcohol dependence. (R. 566.)  Plaintiff remains in treatment to this day under the care of Andrea Cruz,

---

[3] The record does not indicate whether Plaintiff started working at Metro Scanning.
[4] Plaintiff later conceded that there was no evidence coronary artery disease ("CAD") existed prior to his date last insured. He also conceded that the CAD was not diagnosed until 2008, when had a cardiac catheterization and stenting of the proximal left anterior descending coronary artery after experiencing chest pain. (R. 731, 2457.)  Thus, the focus of Plaintiff's disability claim is his psychiatric impairments.

M.D. ("Dr. Cruz") and Fouad Eljarrah, M.D.  ("Dr. Eljarrah").  He attends group therapy twice a week, as well as individualized therapy once per week.  (R. 41, 228.)

### A.  Dr. Andrea Cruz

Plaintiff began individual therapy with Dr. Cruz in September 2007.  (R. 2435.)  Dr. Cruz opined that Plaintiff showed signs of depression as early as high school, at which time he reported isolating himself and staying in bed for days at a time.  (R. 360, 1106.)  Plaintiff's depression had resulted in complete social isolation, suicidal and homicidal ideation, and poor overall functioning. (R. 360, 432, 1106.)  She further opined that "[given] the chronicity in the history and the ongoing symptoms of depression and anxiety …. [Plaintiff] was disabled well prior to 2004…."  (R. 1106, 2463.)

Dr. Cruz observed that at the time Plaintiff started therapy, he was combative and would become highly rigid, angry and defensive when he was forced to confront issues in his life that made him uncomfortable.  (R. 222, 241, 450, 464.)  She noted on multiple occasions that Plaintiff appeared tense and anxious, but he was unaware of these feelings despite behavioral and physiological changes.  (R. 222, 359.)  However, after a few months, Dr. Cruz opined that Plaintiff had made "some strides in getting connected and improving his depression."  (R. 360.)  Plaintiff reported he felt "more sociable, more motivated and looking more positive about the future" and that his suicidal and homicidal ideations have subsided with treatment.  (R. 326, 484, 509, 522, 550, 561, 562.)  Overall, Plaintiff reported that his depression, motivation, and communication skills have improved since he began treatment.  (R. 369.)

Despite Plaintiff's progress with treatment, Dr. Cruz reports that he still continues to experience "symptoms of major depression and anxiety which impact his overall functioning."  (R. 1106.)  He remains isolated and has not developed many interests or activities outside the VA

system.  (R. 366.)  Dr. Cruz consistently noted throughout therapy that Plaintiff procrastinates and is unable to complete simple tasks to improve his life, which she believes is linked to his social anxiety and depression.  (R. 214, 222, 360, 364, 377, 432.)  Plaintiff also reported he still struggles with having a sense of purpose and finding meaning in his life.  (R. 437.)

### B.  Dr. Fouad Eljarrah

Plaintiff is additionally treated by Dr. Eljarrah, a psychiatrist, who provides Plaintiff with medication for depressive symptoms, individual therapy and group therapy.  (R. 2362.)  In the most current record, Plaintiff was on eleven different medications including Buspirone and Citalopran Hydrobromide for anxiety and depression; Chlortalidone for hypertension; and Zolpidem Tartrate for sleep.  (R. 2618.)

Dr. Eljarrah consistently indicated that although Plaintiff's affect remained anxious, his delusions, hallucinations, and suicidal and homicidal ideations have subsided with treatment and he presented with no cognitive impairments.  (R. 216, 342, 374, 407, 436, 448, 575.)  Although on two occasions, Dr. Elijarrah noted that Plaintiff was asymptomatic and Plaintiff reported he was not depressed, Dr. Elijarrah maintains that Plaintiff was still clinically depressed, continued to procrastinate and needed assistance with personal and social issues. (R. 216, 342, 374, 436.)  Dr. Eljarrah further concurred with Dr. Cruz's assessment "that [Plaintiff's] disability existed before 9/30/2014" and further opined that "alcohol was not a significant contributing factor to his disability."  (R 2362.)

Dr. Eljarrah performed a Psychiatric Review Technique ("PRT") on March 4, 2011.  (R. 2365-77.)  He noted Plaintiff suffered from depressive syndrome (12.04), anxiety-related disorders (12.06), and substance addiction disorders (12.09).  (R. 2365.)  He further noted Plaintiff met "paragraph A" and "B" criteria, as well as "paragraph C" criteria.  (R. 2363-77.)  To support his

findings as to depressive syndrome under "paragraph A" criteria, Dr. Eljarrah stated Plaintiff suffered from a pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, psychomotor agitation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide.  (R. 2368.)

Under anxiety-related disorders, Dr. Eljarrah found Plaintiff suffered from generalized persistent anxiety, persistent irrational fears, panic attacks, recurrent obsessions or compulsions and recurrent and intrusive recollections of a traumatic experience, thus satisfying "paragraph A" criteria under listing 12.06.  (R. 2370.)

Dr. Eljarrah further found that Plaintiff satisfied "paragraph B" criteria under 12.04 and 12.06.  (R. 2375-76.)  Dr. Eljarrah opined that Plaintiff has a marked limitation in activities of daily living, a marked limitation in maintaining social function and a marked limitation in maintaining concentration, persistence or pace.  (R. 2375.)  The PRT further indicated that Plaintiff had three episodes of decompensation, each of extended duration.  (*Id.*)

Lastly, Dr. Eljarrah's PRT indicated that Plaintiff met "paragraph C" criteria of the Listings.  (R. 2376.)  He noted that Plaintiff experienced repeated, extended episodes of decompensation, a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause the individual to decompensate, and a current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.  (*Id.*)

C.  Dr. Marc Friedman

Plaintiff was also evaluated on December 15, 2014 by independent medical examiner Marc Friedman, Ph.D. ("Dr. Friedman") who concluded that Plaintiff showed signs of major depressive

disorder and general anxiety disorder.  (R. 3391.)  Plaintiff reported that he had great difficulty getting motivated to do anything and procrastinates all the time.  (R. 3388.)  Upon evaluation, Dr. Friedman observed that Plaintiff's voice quavered frequently, he stammered and his hands were very shaky.  (R. 3389.)  He noted that Plaintiff's social interaction skills were limited due to anxiety, and although his long-term memory appeared to be adequate, his short term memory was moderately impaired.  (*Id*.)

### 3.   Hearing Testimony

At hearings conducted by ALJ Olarsch on June 16, 2011; April 16, 2015; and August 13, 2015; Plaintiff's treating physicians, an independent medical expert and a vocational expert testified as to Plaintiff's mental impairments. Plaintiff also testified about his education, previous employment, medical ailments and treatments, and daily activities.  (R. 2486-90.)

Before testimony began, ALJ Olarsch told Plaintiff's attorney, "you can go very short on this…. nothing too long. I'll let you put the doctor on and … [Plaintiff] can testify for a short period, very short…"  (R. 2457.)  Plaintiff testified that he had previously seen a psychiatrist for marriage counseling and later depression in the late 1980s or early 1990s.  (R. 2486.)  He was prescribed antidepressants, which he stopped taking after he experienced negative side effects.  (R. 2487.)  Plaintiff further testified that he believed his isolation from others and living situation were normal.  (R. 2488.)  He stated that he saw people going to work and would think "… what's your point. We're going to die anyway …, I didn't know … that I was seriously depressed."  (R. 2490.)  During this time, Plaintiff thought about going to a psychiatrist, but his procrastination prevented him from taking any action until 2007.  (*Id*.)

Before Dr. Cruz testified, ALJ Olarsch again emphasized his desire for brevity by stating, "Try and make it brief, all right?"  (R. 2462.)  Dr. Cruz then testified that Plaintiff currently has

major depressive disorder and anxiety-related disorder.  (R. 2463.)  She opined that prior to treatment in 2007, and before the date last insured, Plaintiff's diagnoses were more severe because he wasn't receiving psychiatric treatment.  (R. 2463, 2470.)  She based this opinion on his living situation, as well as Plaintiff's reported suicidal ideations, loss of motivation and purpose, and low self-worth.  (R. 2469.)  She also testified that Plaintiff did not have any friends, did not have any social outlets and spent most of his time in the attic or sleeping.[5]  (R. 2469.)  ALJ Olarsch then interrupted Dr. Cruz's testimony and stated, "You know, we're really running late. I have seven cases waiting."  (R. 2476.)   After repeated requests from Plaintiff's attorney to continue questioning his witness, Dr. Cruz testified that Plaintiff would not be able to work because he has extreme difficulty doing the "most minimal tasks to get himself into better housing or to complete a form… he procrastinates. He's not able to motivate himself…."  (R. 2478, 2485.)  Dr. Cruz was then asked by Plaintiff's counsel to elaborate as to the checked off boxes on the PRT form filled out by Dr. Eljarrah.  (R. 2477.)  ALJ Olarsch interrupted Dr. Cruz again asserting that he did not know what Plaintiff was going to gain by this and that Plaintiff should testify because he might be able to say things that are "less speculative and perhaps more hands on about his condition."  (R. 2478.)  When Dr. Cruz continued with describing the reasoning behind the PRT, ALJ Olarsch stopped her and stated, "… that's enough testimony …. I really don't want to hear this anymore…."  (R. 2484.)

Paul Fulford, M.D., an independent medical examiner, was set to testify at the April 16, 2015 hearing, but he was not given adequate records to assess Plaintiff's condition, delaying his testimony until the next hearing. At the next hearing on August 13, 2015, Dr. Fulford opined that Plaintiff had major depressive disorder, which would be equal to the Social Security Listings of

---

[5] Her testimony was also corroborated by a letter written by Plaintiff's sister.  (R. 2466.)

12.04, as well as affective disorder with some psychotic features. (R. 2440, 2448.) He also opined that given the record before him, an approximate onset date of Plaintiff's disability was 1997. (R. 2449.) Dr. Fulford based his opinion on the consistency of medical opinions of Dr. Cruz, Dr. Eljarrah and Dr. Friedman, as well as Plaintiff's living situation between 1997-2007. (R. 2440-42.) He testified that Plaintiff's "unhealthy", "eccentric" and "unlivable" living situation was "self-injurious" and "suicidal indirectly." (R. 2441.)

Vocational Expert Jackie Wilson ("VE Wilson") also testified at the administrative hearing to determine whether there existed work in the national economy that someone such as Plaintiff could perform. (R. 2449-51.) VE Wilson opined that based on a hypothetical individual with Plaintiff's circumstances, there existed several representative jobs in the light exertional range, such as an inspector, a hand packager and a photocopy machine operator. (R. 2450.) She further stated that if Plaintiff was off-task fifteen percent or more of the workday due to his mental difficulties, it would preclude employment. (*Id.*)

## II.   LEGAL STANDARD

### A.  Standard of Review

In Social Security appeals, this Court has plenary review of the legal issues decided by the Commissioner. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). Yet, this Court's review of the ALJ's factual findings is limited to determining whether there is substantial evidence to support those conclusions. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal citation and quotations omitted).

Substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla'; it is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x. 613, 616 (3d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Importantly, "[t]his standard is not met if the Commissioner 'ignores, or fails to resolve, a conflict created by countervailing evidence.'" *Bailey*, 354 F. App'x. at 616 (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). However, if the factual record is adequately developed, "'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Daniels v. Astrue*, No. 4:08-cv-1676, 2009 WL 1011587, at *2 (M.D. Pa. Apr. 15, 2009) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). "The ALJ's decision may not be set aside merely because [a reviewing court] would have reached a different decision." *Cruz v. Comm'r of Soc. Sec.*, 244 F. App'x. 475, 479 (3d Cir. 2007) (citing *Hartranft*, 181 F.3d at 360). This Court is required to give substantial weight and deference to the ALJ's findings. *See Scott v. Astrue*, 297 F. App'x. 126, 128 (3d Cir. 2008). Nonetheless, "where there is conflicting evidence, the ALJ must explain which evidence he accepts and which he rejects, and the reasons for that determination." *Cruz*, 244 F. App'x. at 479 (citing *Hargenrader v. Califano*, 575 F.2d 434, 437 (3d Cir. 1978)).

In considering an appeal from a denial of benefits, remand is appropriate "'where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits.'" *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) (quoting *Saldana v. Weinberger*, 421 F. Supp. 1127, 1131 (E.D. Pa. 1976)). Indeed, a decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the

claimant is disabled and entitled to benefits." *Podedworny v. Harris*, 745 F.2d 210, 221–22 (3d Cir. 1984) (citations omitted).

### B. The Five–Step Disability Test

A claimant's eligibility for social security benefits is governed by 42 U.S.C. § 1382. An individual will be considered disabled under the Act if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" lasting continuously for at least twelve months. 42 U.S.C. § 423(d)(1)(A). The impairment must be severe enough to render the individual "not only unable to do his previous work but [unable], considering his age, education, and work experience, [to] engage in any kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A claimant must show that the "medical signs and findings" related to his or her ailment have been "established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged . . . . " 42 U.S.C. § 423(d)(5)(A).

To make a disability determination, the ALJ follows a five-step sequential analysis. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also Cruz v. Comm'r of Soc. Sec.*, 244 F. App'x 475, 480 (3d. Cir. 2007). If the ALJ determines at any step that the claimant is or is not disabled, the ALJ does not proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

Step one requires the ALJ to determine whether the claimant is engaging in substantial gainful activity ("SGA"). 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). SGA is defined as work that "[i]nvolves doing significant and productive physical or mental duties . . . for pay or profit." 20 C.F.R. §§ 404.1510, 416.910. If the claimant engages in SGA, the claimant is not

disabled for purposes of receiving social security benefits regardless of the severity of the claimant's impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the individual is not engaging in SGA, the ALJ proceeds to step two.

Under step two, the ALJ determines whether the claimant suffers from a severe impairment or combination of impairments that meets the duration requirement found in Sections 404.1509 and 416.909. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  An impairment or a combination of impairments is not severe when medical and other evidence establishes only a slight abnormality or combination of abnormalities that would have a minimal effect on an individual's ability to work. 20 C.F.R. §§ 404.1521, 416.921; SSR 85-28, 96-3p, 96-4p.  An impairment or a combination of impairments is severe when it significantly limits the claimant's "physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c).  If a severe impairment or combination of impairments is not found, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the ALJ finds a severe impairment or combination of impairments, the ALJ then proceeds to step three.

Under step three, the ALJ determines whether the claimant's impairment or combination of impairments is equal to, or exceeds, one of those included in the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If an impairment or combination of impairments meets the statutory criteria of a listed impairment as well as the duration requirement, the claimant is disabled and entitled to benefits. 20 C.F.R. §§ 404.1520(d), 416.920(d).  If, however, the claimant's impairment or combination of impairments does not meet the severity of the listed impairment, or if the duration is insufficient, the ALJ proceeds to the next step.

Before undergoing the analysis in step four, the ALJ must determine the claimant's residual

functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(a), 404.1520(e), 416.920(a), 416.920(e).  An individual's RFC is the individual's ability to do physical and mental work activities on a sustained basis despite limitations from his or her impairments. 20 C.F.R. §§ 404.1545, 416.945.  The ALJ considers all impairments in this analysis, not just those deemed to be severe. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); SSR 96-8p.  After determining a claimant's RFC, step four then requires the ALJ to determine whether the claimant has the RFC to perform the requirements of his or her past relevant work. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).  If the claimant is able to perform his or her past relevant work, he or she will not be found disabled under the Act. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f).  If the claimant is unable to resume his or her past work, the disability evaluation proceeds to the fifth and final step.

At step five, the ALJ must determine whether the claimant is able to do any other work, considering his or her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  Unlike in the first four steps of the analysis where the claimant bears the burden of persuasion, the burden shifts to the ALJ at step five to determine whether the claimant is capable of performing an alternative SGA present in the national economy. 20 C.F.R. §§ 404.1520(g)(1) (citing 404.1560(c)), 416.920(g)(1) (citing 416.960(c)); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987).  At this point in the analysis, the SSA is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [the claimant's RFC] and vocational factors." 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2).  If the claimant is unable to do any other SGA, he or she is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III.   DISCUSSION

#### A.  ALJ Olarsch's 2015 decision

In the 2015 Decision, ALJ Olarsch concluded that Plaintiff was not disabled.  (R. 2399.) At step one of the disability analysis, ALJ Olarsch found that Plaintiff had not engaged in SGA since the alleged onset date of May 30, 2000.  (R. 2390.)  At step two, ALJ Olarsch found that Plaintiff suffered from the following severe impairments: major depressive disorder and anxiety disorder.  (R. 2391.)  However, at step three, ALJ Olarsch concluded that Plaintiff's impairments did not equal or exceed the impairments included in the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).  (R. 2391.)  ALJ Olarsch found Plaintiff did not satisfy "paragraph B" criteria under medical listings 12.04 and 12.06 because there was no evidence of at least two "marked" limitations in two domains of functioning or one "marked" limitation and repeated episodes of decompensation.  (R. 2391-92.)  ALJ Olarsch also concluded that Plaintiff did not meet "paragraph C" criteria under 12.04 and 12.06 because there was no evidence of decompensation, no evidence of a residual disease process predicted to cause decompensation and no evidence of any year or longer stays in a highly supportive living arrangement.  (R. 2393.)  He also found Plaintiff did not satisfy "paragraph C" criteria because there is no evidence that Plaintiff "is completely unable to function independently outside his home."  (*Id*.)

ALJ Olarsch then addressed Plaintiff's residual functional capacity, finding that Plaintiff can "perform a full range of work at all exertional levels with the following non-exertional limitations: the [Plaintiff] is limited to simple routine repetitive tasks involving only simple work related decisions, few work place changes, and only occasional interaction with supervisors, coworkers, or the general public."  (R. 2393-94.)  At step four, the ALJ determined that these limitations would prevent Plaintiff from being able to perform his past relevant work.  (R. 2398.) Finally, at step five, ALJ Olarsch found that even with the prescribed limitations, Plaintiff would

be able to perform the nationally available jobs as an inspector/hand packager, a photocopy machine operator or a sealing and cancelling machine operator.  (R. 2398.)  Thus, the ALJ determined that Plaintiff was not disabled within the meaning of the Act.   (R. 2399.)

### B.  The ALJ's Findings Are Not Supported by Substantial Evidence

In weighing medical evidence, treating physicians' reports should be accorded great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."  *Plummer v. Apfel*, 186 F.3d 422 at 429 (citing *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987); 20 C.F.R. § 404.1527(d)(2)).  An ALJ "may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided."  *Id.* (citing *Newhouse v. Heckler,* 753 F.2d 283, 286 (3d Cir.1985)).  Finally, an ALJ "cannot reject evidence for no reason or for the wrong reason."  *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993). The ALJ must "consider all evidence and give some reason for discounting the evidence he rejects."  *Plummer v. Apfel*, 186 F.3d 422 at 429.

The ALJ, in reviewing the medical evidence on record, as well as the testimony at the hearings, improperly discredited the opinions of Plaintiff's treating psychologist, Dr. Cruz, and Plaintiff's treating psychiatrist, Dr. Eljarrah, who both determined that Plaintiff was disabled prior to the date last insured. ALJ Olarsch did not set forth any legitimate basis for substituting his judgment for the unanimous opinion of Plaintiff's physicians and unified medical records.

### 1.  Dr. Cruz

ALJ Olarsch first discounted Dr. Cruz's medical opinion because he determined "her opinion is not consistent with the overall evidence of record."  (R. 2396-97.)  The ALJ concluded that Plaintiff "appears stable with conservative care and sobriety" and "had largely normal

mental status examinations." (R. 2395.) In coming to this conclusion, ALJ Olarsch cites to less than ten treatment notes within a voluminous record consisting of 3405 pages. Further, the few treatment notes that he points to are observations of Plaintiff's behavior during therapy sessions or in structured therapeutic environments.[6] A doctor's opinion that Plaintiff is "seriously impaired … shall not be supplanted by an inference gleaned from treatment records reporting on the [Plaintiff] in an environment absent of the stresses that accompany the work setting." *Morales v. Apfel*, 225 F.3d 310 at 319 (stating a "doctor's observation during treatment does not [necessarily] support the medical conclusion that [the patient] can return to work.") In viewing the medical record in its entirety, Dr. Cruz's progress notes are consistent with her medical opinion that Plaintiff's disability is severe.

ALJ Olarsch also refused to give credence to Dr. Cruz's opinion because he found she was "sympathetic to her patient." (R. 2395.) However, a review of Dr. Cruz's testimony shows her opinion is based on substantial evidence, including Plaintiff's living conditions over the past twenty years, Plaintiff's own statements, the consistency of other medical opinions, and her own observations. ALJ Olarsch failed to identify any evidence in the record that reveals bias on Dr. Cruz's part.

Finally, ALJ Olarsch asserted that Dr. Cruz "did not adequately explain how she determined that [Plaintiff] was disabled three years before she met him." (R. 2396-97.) The record, however, clearly reflects that Dr. Cruz explained the basis of her opinion in response to inquiries posed by the ALJ and Plaintiff's attorney at the June 16, 2011 hearing, in her 2010

---

[6] ALJ Olarsch notes that Plaintiff was able to take part in group therapy and during these sessions he related well and had good eye contract. (R. 2391.) The ALJ also points to the fact that Plaintiff was able to participate in the Compensated Work Program, which indicated "he had a good cognitive function." (*Id.*)

report[7] and throughout her progress notes.  (R. 43, 48.)  Dr. Cruz testified that she did not think "anybody in a right mental state would be living in an attic for over 10 years with family members encouraging him to move into an apartment in the basement…."  (R. 2464, 2469.)   Her conclusion was corroborated by Dr. Friedman who described Plaintiff's living situation as "indirectly suicidal" and "self-injurious," and a letter from Plaintiff's sister.  (R. 44, 2441.) Based on the record before him, ALJ Olarsch could not have reasonably rejected Dr. Cruz's medical opinion.

2.  <u>Dr. Eljarrah</u>

ALJ Olarsch also gave Dr. Eljarrah's medical opinion little weight because he found it was "inconsistent with the medical evidence of record."  (R. 2396.)  Yet, as with Dr. Cruz, ALJ Olarsch points to isolated notes within the medical record to support his findings, while ignoring the quantity and consistency of the medical evidence and physician's opinions showing otherwise.

ALJ Olarsch then concluded that he was not required to accord controlling weight to Dr. Eljarrah's Psychiatric Review Technique because it is a fill-in-the-blank style form that lacked adequate explanations as to the basis for his findings.  (R. 2396.)  However, Dr. Cruz, who works closely and consults with Dr. Eljarrah on Plaintiff's case, testified as to the factual basis and reasoning of the diagnoses, which gave context to the boxes that were checked on the form.  (R. 55.)  For instance, she testified as to "paragraph A" criteria under 12.04, explaining that Plaintiff's pervasive loss of interest prior to 2004 can be shown by his lack of motivation and purpose, not working or socializing, and remaining isolated in the attic.  (R. 60.)  She also

_____

[7] "The veteran's depression had resulted in complete social isolation, suicidal ideation, and poor overall functioning…. Given the chronicity noted in the history and the ongoing symptoms of depress and anxiety…. [Plaintiff] was disabled well prior to 2004."  (R. 1106.)

18

testified that Plaintiff had a pattern of sleep disturbance, which is consistent with depressive symptoms.  (R. 61.)  However, Dr. Cruz was unable to complete her analysis of Dr. Eljarrah's PRT because ALJ Olarsch stated he did not wish to hear any more of her testimony.  (R. 2482-83.)

### 3.  Independent Medical Experts

Finally, ALJ Olarsch did not give proper weight to the medical opinions of the independent medical experts, Dr. Friedman and Dr. Fulford, who both found Plaintiff met the listing criteria for depressive disorder and anxiety disorder. ALJ Olarsch discredited Dr. Friedman's report because it was "based on a one-time examination, which had to rely heavily on [Plaintiff's] subjective statements and presentation."  (R. 2396.)  He then rejected Dr. Fulford's testimony because he "did not adequately explain how he was able to determine the claimant met the listing prior to 2004 as there are no medical records prior to 2007" and it was based on "claimants subjective statements."  (R. 2397.)  ALJ Olarsch based his opinion on the inference that a mental impairment cannot be conclusively established without contemporaneous medical records, an error that required remand for further proceedings as to his prior decision. *See Mee v. Comm'r of Soc. Sec.*, 13-3754.  ALJ Olarsch identifies no medical support that a mental impairment cannot be established based on the treating physician's medical opinions and history provided by the Plaintiff. Thus, ALJ Olarsh's rejection of Dr. Friedman and Dr. Fulford's medical opinions is improper because it is against the weight of the evidence.

### C.  Plaintiff's Affective Disorder and Anxiety-Related Disorder Met or Medically Equaled the Listing Criteria Before the Date Last Insured

A claimant's affective disorder meets or medically equals listing 12.04 when it satisfies both "paragraph A" and "B" criteria, or, in the alternative, satisfies "paragraph C" criteria.

To satisfy the Paragraph B criteria of listing 12.04 and 12.06, Plaintiff must demonstrate that his affective disorder and his anxiety-related disorder result in at least two of the following:

   1. Marked restriction of activities of daily living; or

   2. Marked difficulties in maintaining social functioning; or

   3. Marked difficulties in maintaining concentration, persistence, or pace; or

   4. Repeated episodes of decompensation, each of extended duration ....

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04. A limitation is "marked" when "it is more than moderate but less than extreme." (*Id.*) As noted above, Dr. Cruz and Dr. Eljarrah's medical opinions concluding that Plaintiff's affective disorder and anxiety-related disorder met the listing criteria should be given controlling weight. The administrative record is well developed and indicates Plaintiff was disabled on the date last insured. Instead, ALJ Olarsch found Plaintiff's affective disorder did not meet listing criteria, specifically focusing on paragraph B criteria.[8] ALJ Olarsch found Plaintiff had moderate limitations in the first three categories, and that Plaintiff did not have any repeated episodes of decompensation. (R. 2391-92.)

With regard to Plaintiff's activities of daily living, ALJ Olarsch concluded that Plaintiff had only a moderate restriction because Plaintiff "often went out to eat," "belonged to a gym" and was "assisting in computer use classes." (R. 2392.) However, Plaintiff dined out often because he did not have a refrigerator, kitchen or storage unit for food and received many of his meals from either soup kitchens or homeless shelters. (R. 49.) Further, Plaintiff joined a gym at the suggestion of doctors due to his obesity, but reports working out only once and used the facilities only occasionally to bathe since there was no shower in the attic he was living in for ten years. (R. 228,

---

[8] ALJ Olarsch does not dispute in his opinion nor in the hearings that Plaintiff met "paragraph A" criteria. Thus, this Court deems Plaintiff to have satisfied the paragraph A criteria.

234, 2438-39.)  Finally, Plaintiff's participation in the Compensatory Work Therapy Program ("CWT") in the computer lab is not an accurate representation of his activities of daily living. Participation in the CWT is part of Plaintiff's therapeutic treatment that fosters safe and low-stress environments to improve life skills. It should not be used as evidence of appropriate functioning.[9] Outside of the CWT, Plaintiff continues to isolate himself, and Dr. Eljarrah and Dr. Cruz found Plaintiff suffered marked restrictions of daily activities.  (R. 49.)

ALJ Olarsch, relying on the above facts, also concluded that Plaintiff had only a moderate restriction in social functioning. (R. 2392.)  However, for the reasons stated above, Plaintiff's dining out, going to the gym and assisting with computer classes are not indicative of his social functioning. ALJ Olarsch also emphasized that Plaintiff was able to take part in group therapy, his mental status examinations regularly noted he related well, and he had good eye contact.  (*Id*.)  As discussed above, observations during mandated components of therapy are not necessarily reflective of Plaintiff's functioning. The evidence indicates that Plaintiff has not developed any activities or interests outside the VA program.  (R. 366.)  The medical record also consistently demonstrates that Plaintiff isolated himself, he cut off all ties with his family even though they lived in the same home, and he had no social outlets.  (R. 45, 2470.)

The ALJ further concluded that Plaintiff had only moderate difficulties in maintaining concentration, persistence or pace.  (*Id*.)  To do so, the ALJ noted that Plaintiff likes to study foreign languages, read, and watch television, "which indicates some ability to focus and follow a story."  ALJ Olarsch also pointed to Plaintiff's participation in the CWT Program, which as noted above is not indicative of his functioning. He ignored Dr. Cruz and Dr. Eljarrah's reports that

---

[9] The ALJ also cited to activities that are outside of the relevant period to support his conclusion that Plaintiff was not disabled.  (R. 2392-94.).

Plaintiff procrastinated greatly and was barely capable of finishing simple tasks, such as filling out a standard form to improve his life, as well as Dr. Friedman's report that Plaintiff's short-term memory was impaired. [10]  (R. 2485, 3389.)  In sum, the ALJ's finding that Plaintiff is not disabled is not supported by substantial evidence in the record and thus warrants reversal.

### D.  Reversal and Remand for the Determination of Benefits

#### 1.  Reversal of ALJ Olarsch's Decision is Appropriate

The question remaining is whether this case should be remanded for further administrative proceedings or reversed with direction to award benefits. 42 U.S.C.A. 405(g).  "[T]he decision to direct the district court to award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence in the record as a whole indicates that the claimant is disabled and entitled to benefits."  *Schonewolf v. Callahan*, 972 F.Supp. 277 (*citing Podedworny v. Harris*, 745 F.2d at 221-223).

There exists substantial evidence in the voluminous 3405 page record showing Plaintiff suffers from a severe mental disability that renders him disabled within the meaning of the Act since his date last insured. The medical opinions of four treating and non-treating physicians and progress notes from therapy sessions support the conclusion that Plaintiff was disabled prior to September 30, 2004.

 When "further administration proceedings would simply prolong [Plaintiff's] waiting and delay his ultimate receipt of benefits, reversal is especially appropriate.  (*Id*.)  This case was originally filed in 2008 and ongoing delays have prevented its timely resolution. Pursuant to the remand order dated May 5, 2014, Plaintiff sought a ruling on the specific issue as to whether he

---

[10] Since Plaintiff meets "paragraph A" and "B" criteria and is therefore considered disabled, this Court need not determine whether Plaintiff met the "paragraph C" criteria.

was disabled prior to September 30, 2004.  *Mee v. Comm'r of Soc. Sec*, 13-3754 at 12.   However, ALJ Olarsch failed to provide the medical experts with the proper records on two separate occasions.   During the April 16, 2015 hearing, Dr. Fulford did not receive the complete record to evaluate Plaintiff's disability, causing the hearing to be postponed until August 2015.  (R. 2421.) Further, Plaintiff's representation indicated Dr. Friedman was also not given the correct records in order to evaluate the onset date.  (*Id.*)  Because we find that substantial evidence in the present record dictates a finding that Plaintiff is disabled, remand for further hearings is unnecessary and would only further delay Plaintiff's case.  Thus, this Court will reverse the 2015 Decision and remand with directions to award Plaintiff benefits.

## 2.   Remand to a Different ALJ is Warranted

Although it is generally this Court's practice to remand a case back to the ALJ that heard it, such a remand is inappropriate here.   An ALJ is required to conduct a Social Security hearing "in a fair and impartial manner."  *Correa ex rel. Correa v. Comm'r of Soc. Sec.*, 381 F.Supp.2d 386 at 387.   "[T]he due process requirement of an impartial decisionmaker is applied more strictly in administrative proceedings than in court proceedings because of the absence of procedural safeguards normally available in judicial proceedings." *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir.1995) (*citing Hummel*, 736 F.2d at 93). If an ALJ acts with extreme impatience, hostility or condescension towards a plaintiff or the plaintiff's representative during a hearing, that case should be remanded to a different ALJ.  *Correa*, 381 F.Supp.2d 386 (citing *Ventura v. Shalala*, 55 F.3d 900 (3d Cir. 1995)); *see also Robinson v. Comm'r of Soc. Sec.*, 07-3455, 2009 WL 872030 (D.N.J. 2009) (finding remand to a new ALJ proper when the ALJ appeared biased, as indicated by his marked disdain for the remand process and his enmity towards Plaintiff's counsel, shown by his

blatant antagonism during a hearing); *Rosa v. Bowen*, 677 F.Supp 782 (D.N.J. 1988) (remanding to a different ALJ where the original ALJ's most pressing concern was expedience).

During the April 16, 2015 hearing, ALJ Olarsch stated on four separate occasions his desire to keep the questioning of Plaintiff's witnesses brief, with remarks to Plaintiff's representative such as "go very short on this," "try to make it brief," and "I have seven cases waiting."   (R. 35, 41, 57.)  Additionally, ALJ Olarsch interrupted Dr. Cruz mid-testimony while she was elaborating upon Dr. Eljarrah's Psychiatric Review Technique (a medical report he later discredited because it was a check box form with no corresponding explanation) by stating "I really don't want to hear this anymore."  (R. 64.)  Although this Court is sympathetic to the competing demands of a busy docket, a complete and thorough hearing must outweigh expedience and brevity.

ALJ Olarsch's line of questioning also raises questions of bias.  At the August 2015 hearing, ALJ Olarsch repeatedly asked Dr. Fulford what evidence there was to show Plaintiff was disabled prior to 2004, even after Dr. Fulford answered the question multiple times.  (R. 2437, 2437, 2440, 2441, 2445.)   When Plaintiff's counsel objected to ALJ Olarsch 'browbeating' the medical expert, the ALJ threatened to stop the hearing.  (R. 2445.)  When Plaintiff's representation noted that there was psychiatric evidence, ALJ Olarsch interjected that "it's not going to be rocket science. Let's not make a Federal case out of it."  (R. 2437.)

This Court finds that ALJ Olarsch's remarks regarding expediency and resistance to accepting the testimony of the medical professionals are enough to raise the possibility that Plaintiff was denied a full and fair hearing before an impartial jurist, thus depriving him of the requisite due process protection.

IV.   **CONCLUSION**

Because this Court finds that ALJ Olarsch's decision is not supported by substantial evidence in the record, the Commissioner's determination is **REVERSED AND REMANDED** to a new ALJ for determination of benefits.

s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig:   Clerk
cc:     Parties

25